1   Dan Stormer, Esq. [S.B. # 101967]
    Barbara Enloe Hadsell, Esq. [S.B. #086021]
2   Shaleen Shanbhag, Esq. [S.B. #301047]
    HADSELL STORMER RENICK & DAI LLP
3   128 N. Fair Oaks Avenue
    Pasadena, California 91103
4   Telephone: (626) 585-9600
    Facsimile:  (626) 577-7079
5   Emails: dstormer@hadsellstormer.com
            bhadsell@hadsellstormer.com
6           sshanbhag@hadsellstormer.com

7   Attorneys for Plaintiff
    BENJAMIN MONTEMAYOR

8

9                  **UNITED STATES DISTRICT COURT**

10                **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11  BENJAMIN MONTEMAYOR, | Case No.: |
| 12             Plaintiff, | **COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF:** |
| 13        v. | |
| 14  CITY OF LOS ANGELES; CHIEF MICHEL MOORE; and DOES 1-10, | 1. Excessive Force (42 U.S.C. § 1983 4th and 14th Amendments) |
| 15             Defendants. | 2. Failure to Intervene (42 U.S.C. § 1983 4th and 14th Amendments) |
| 16 | |
| 17 | 3. Freedom of Speech and Association (42 U.S.C. § 1983 1st and 14th Amendments) |
| 18 | |
| 19 | 4. Municipal Liability— Unconstitutional Policy, Practice, or Custom (42 U.S.C. § 1983) |
| 20 | |
| 21 | 5. Municipal Liability—Ratification (42 U.S.C. § 1983) |
| 22 | 6. Municipal Liability—Failure to Train, Supervise, Discipline, or Correct (42 U.S.C. § 1983) |
| 23 | |
| 24 | 7. Violation of the Bane Act (Cal. Civil Code § 52.1) |
| 25 | |
| 26 | 8. Violation of the Ralph Act (Cal. Civil Code § 51.7) |
| 27 | 9. Assault |
| 28 | 10.Battery by Peace Officer |

COMPLAINT FOR DAMAGES &
DECLARATORY RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11. Negligence

12. Intentional Infliction of
    Emotional Distress

13. Declaratory Relief
    (28 U.S.C. § 2201)

**[DEMAND FOR JURY TRIAL]**

## I.   INTRODUCTION

1.      This case is a horrific example of the unjustified police abuse and First Amendment retaliation meted out violently against peaceful protestors. It arises out of the 2020 national protests sparked by the May 2020 police killing of George Floyd. In May and June 2020, millions of people across the nation gathered to demand police accountability and protest police brutality and racism.

2.      On June 2, 2020, Los Angeles filmmaker Benjamin Montemayor attended a protest in Hollywood.  As he marched, Mr. Montemayor and his friend carried a large, hand-painted banner measuring 7.6 feet by 3.8 feet, which read:

### PROTECT OUR COMMUNITIES

### DEFUND POLICE

### BLACK LIVES MATTER

3.      Approximately 10,000 demonstrators were present in Hollywood that day. The crowd was nonviolent and peaceful despite the heavy police presence. Mr. Montemayor and his friends marched peacefully in Hollywood for hours, until, without any warning, Los Angeles Police Department officers outfitted in riot gear indiscriminately unleashed so-called "less lethal" chemical and projectile weapons at the crowd and formed a skirmish line across Hollywood Boulevard.

4.      Mr. Montemayor and his friend, both terrified, walked slowly backward, away from the skirmish line while still raising the above-described banner.  Without announcement or warning, Los Angeles Police Department officers targeted and attacked Mr. Montemayor and his friend because they were holding the banner—one officer ripped the banner from Mr. Montemayor's hand, and a second officer violently shoved him. As Mr. Montemayor stood there, unarmed, not resisting arrest, posing no threat whatsoever to anyone around him, and having just been violently shoved, a third officer less than ten feet away aimed his green 40mm launcher at Mr. Montemayor and intentionally shot him in the groin with a high-speed plastic, hard foam projectile.

5.      Mr. Montemayor was severely injured, in excruciating pain, and required

COMPLAINT FOR DAMAGES &
DECLARATORY RELIEF

-1-

emergency testicular surgery within hours.

## II.   JURISDICTION AND VENUE

2.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Plaintiff asserts claims arising under the laws of the United States including 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments of the United States Constitution.

3.      Venue is proper in this Court because all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, California.

## III.   PARTIES

4.      Plaintiff Benjamin Montemayor is a twenty-nine-year-old man who resides in Los Angeles, California.  Mr. Montemayor was attacked and shot by Defendants and/or their agents with a 40mm impact projectile, subjecting him to injuries and damages as described herein. Mr. Montemayor sues Defendants for the violation of his rights under state and federal laws.

5.      Defendant City of Los Angeles ("the City") is a duly organized public entity existing under the laws of the State of California. The Los Angeles Police Department ("LAPD") is the law enforcement agency for Defendant City. The City is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including LAPD and its agents and employees. At all relevant times, Defendant City was responsible for ensuring that the actions, omissions, policies, procedures, practices, and customs of the City and its agencies, employees, and agents complied with the laws of the United States and the State of California.

6.      Defendant Michel Moore is the duly appointed Chief of Police for the LAPD, and an employee of the City. Defendant Moore holds the highest position in the LAPD and is/was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all LAPD employees and/or agents. At all relevant times herein, Defendant Moore was responsible for the promulgation of the policies and procedures and allowances of the practices/customs pursuant to which the acts of the

Defendant Officers alleged herein were committed. Defendant Moore is being sued in both his individual and official capacities for the purpose of ensuring Plaintiff may obtain complete and effective relief as against LAPD, whose actions and conduct are under the control of the current Chief of Police.

7.      On information and belief, Defendants Does 1-5 are LAPD officers who needlessly accosted, assaulted, and, without any justification, injured Mr. Montemayor (collectively, "Officer Defendants").

8.      At all relevant times, the City was the employer of Defendants Does 1-10. At the time of the incident, Does 1-10 were acting under color of law within the course and scope of their duties as Officers for the LAPD. Does 1-5 were acting with the complete authority and ratification of their principal, Defendant City.

9.      At all relevant times, Does 6-10 were managerial, supervisorial, training, and/or policymaking employees of Defendant City. At the time of the incident, Does 6-10 were acting under color of law within the course and scope of their duties as employees for the LAPD and/or the City. They had supervisorial authority over Does 1-5, and the Officers and employees of the LAPD. Does 6-10 were acting with the complete authority and ratification of their principal, Defendant City.

10.     Does 1-10 are sued in both their individual and official capacities.

11.     On information and belief, Does 1-10 were and still are residents of the County of Los Angeles, California.

12.     In doing the acts and failing to act as hereinafter described, Defendants Does 1-10 were acting on the implied and actual permission and consent of the City.

13.     The true names and capacities of Does 1-10 are unknown to Plaintiff, who otherwise sues these Defendants by such fictitious names. Plaintiff will amend this Complaint or seek leave to do so, when the true names and capacities of these Defendants have been ascertained. Each of the fictitiously named Defendants is responsible in some manner for the acts, omissions, injuries and damages alleged herein.

COMPLAINT FOR DAMAGES &
DECLARATORY RELIEF                          -3-

14.     Plaintiff is informed and believes and thereon alleges that at all times relevant herein, Defendants and each of them were the agents, employees, servants, joint venturers, partners, and/or co-conspirators of the other Defendants named in this Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with Defendants.

15.     All of the acts and omissions complained of herein by Plaintiff against Defendants were done and performed by said Defendants by and through their authorized agents, servants and/or employees, all of whom at all relevant times herein were acting within the course, purpose, and scope of said agency, service, and/or employment capacity. Moreover, Defendants and their agents ratified all of the acts and omissions complained of herein. Whenever and wherever reference is made in this Complaint for Damages to any act or failure to act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and severally.

## IV.   ADMINISTRATIVE PREREQUISITES

16.     Plaintiff exhausted his administrative remedies by timely filing a governmental tort claim with the City pursuant to California Government Code section 910 *et seq.*  The City rejected Plaintiff's tort claim on October 13, 2020.

## V.   FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION
### Nationwide Protests in Response to the Police Killing of George Floyd

17.     The May 25, 2020 murder of George Floyd by Minneapolis police officers, which occurred not long after the unjustified killings of Breonna Taylor and Ahmaud Arbery, sparked a series of protests across the nation demanding justice and calling for police accountability and reform.  Protests began in the Los Angeles area on May 27, 2020 and continued for weeks. Approximately 1,000 National Guard troops were deployed to the Los Angeles area during the last weekend of May 30-31, 2021.

18.     Several organizers promoted events in the Hollywood area on Tuesday, June 2, 2020.  Students for Floyd, a student group from Immaculate Heart High School,

organized a noon demonstration.[1]  Popular rapper YG Tweeted on June 1: "LA meet me. Hollywood Blvd & Vine tomorrow Tuesday 12 noon BLM – George Floyd."  YG called for "positive vibes" and "No looting!"[2]

19.     According to Chief Moore, at least 2,000 National Guard troops were expected to be deployed in Los Angeles on June 2.

20.     At approximately 11:35 a.m. on June 2, Los Angeles County declared a curfew from 6:00 p.m. until 6:00 a.m. the following day. This was the third consecutive night of countywide curfews.

21.     On June 2, the LAPD issued a press release "directing the public to obey the curfew order" and "directing people to stay home and not come to the Hollywood or the Downtown LA area."[3]

## Mr. Montemayor Attends the June 2 Hollywood Protest

22.     By noon, over two hundred people were marching in Hollywood. By 12:30 p.m., the protest had grown to almost one thousand people.[4]  As the number of protestors grew, so did the number of LAPD officers and National Guard troops. Local news described the "heavy police presence on hand monitoring the situation, as the marches continued circling blocks in the Hollywood area."[5]

23.     Mr. Montemayor and his two friends arrived at the Hollywood protest at approximately 12:45 p.m.  Mr. Montemayor attended the protest to publicly denounce George Floyd's killing and to protest police violence and racism. He had attended another protest in Los Angeles the day before.

24.     Upon his arrival, Mr. Montemayor observed hundreds of armed LAPD officers and National Guard troops wearing riot gear and closely monitoring the crowd.

---

[1] https://www.foxla.com/news/theyre-listening-to-us-they-have-no-choice-thousands-join-peaceful-protests-in-hollywood.
[2] https://twitter.com/YG/status/1267629658595459074;
https://www.lamag.com/citythinkblog/protesters-la-why-they-march/.
[3] http://www.lapdonline.org/newsroom/news_view/66598.
[4] https://www.lamag.com/citythinkblog/protesters-la-why-they-march/.
[5] https://www.foxla.com/news/theyre-listening-to-us-they-have-no-choice-thousands-join-peaceful-protests-in-hollywood.

25.     Just before 1:00 p.m., there were reports of several National Guard troops taking a knee alongside protestors.[6] By 1:30 p.m., the protest had grown to a few thousand demonstrators.[7] The LAPD estimated approximately 10,000 protesters gathered in Hollywood and the protest route spanned eight city blocks along Sunset Blvd.[8]

26.     Numerous sources confirmed that the demonstrators remained peaceful despite their growing numbers.  The National Police Foundation's After-Action Report called the June 2 Hollywood march "peaceful."[9] An LAPD officer acknowledged that the Hollywood protest was mostly peaceful.[10]  Local media described the Hollywood protestors as "peaceful,"[11] and engaged in a "massive, nonviolent march."[12]

27.     Mr. Montemayor protested peacefully with his friends for nearly two hours without observing any violent or unlawful conduct.  The crowd of demonstrators— which included families with small children, volunteers handing out water bottles, and medics—walked through the streets of Hollywood while chanting in unison and kneeling in front of police officers on several occasions.

28.     Mr. Montemayor recorded the protest on his cellphone while he marched.

---

[6] https://www.latimes.com/california/story/2020-06-02/hollywood-protesters-ask-national-guard-to-kneel-and-cheer-when-they-do; https://losangeles.cbslocal.com/2020/06/03/national-guard-troops-kneel-with-protesters-in-hollywood/.

[7] https://www.foxla.com/news/theyre-listening-to-us-they-have-no-choice-thousands-join-peaceful-protests-in-hollywood.

[8] https://www.dailynews.com/2020/06/02/thousands-of-protesters-march-in-hollywood-where-they-say-the-looting-has-nothing-to-do-with-us.

[9] National Police Foundation. (2021). A Crisis of Trust: A National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27 – June 7, 2020, *available at* https://ca-times.brightspotcdn.com/29/0e/527ebbe34c548ddf5ad397a9613f/a-crisis-of-trust.pdf.

[10] https://www.latimes.com/california/story/2020-06-02/more-looting-more-arrests-amid-peaceful-protests-in-l-a.

[11] https://www.nbclosangeles.com/news/local/protests-george-floyd-los-angeles-curfew-downtown-la-venice/2373095/; https://www.foxla.com/news/thousands-join-daytime-george-floyd-protests-in-heart-of-hollywood-and-across-southland; https://losangeles.cbslocal.com/2020/06/03/national-guard-troops-kneel-with-protesters-in-hollywood; https://losangeles.cbslocal.com/2020/06/02/hollywood-protest-george-floyd-yg-canceled/.

[12] https://www.dailynews.com/2020/06/02/thousands-of-protesters-march-in-hollywood-where-they-say-the-looting-has-nothing-to-do-with-us/.

29.     As he marched through the streets of Hollywood, Mr. Montemayor and his friend, Tamara Bruketta, held a large, white, handmade banner measuring approximately 7.6 feet by 3.8 feet, depicted below, which stated:

**PROTECT OUR COMMUNITIES**

**DEFUND POLICE**

**BLACK LIVES MATTER**

**Without Warning, LAPD Officers Fire Munitions into the Crowd of Protestors**

30.     At approximately 2:35 p.m., Mr. Montemayor crossed Ivar Avenue while marching westbound on Hollywood Boulevard.  He observed at least fifteen LAPD officers in riot gear run eastbound on Hollywood Boulevard, facing toward the demonstrators. The officers formed an east-facing skirmish line from the north side of Hollywood Boulevard to the south side. The skirmish line, which blocked Hollywood Boulevard, began advancing eastbound toward the demonstrators. All the officers forming the skirmish line were armed, and some officers had drawn their weapons.  It

COMPLAINT FOR DAMAGES &
DECLARATORY RELIEF                                    -7-

appeared that the officers were trying to push the protestors back and/or prevent the westbound-marching protestors from proceeding down Hollywood Boulevard; however, they gave no clear or audible announcements.

31.     Suddenly and without warning, LAPD officers fired chemical and extremely harmful and dangerous kinetic impact projectiles at the peacefully protesting citizens.  Demonstrators immediately began to flee, screaming and scattering in various directions.

32.     One witness reported that prior to the LAPD's deployment of force, the march "was completely peaceful," and "was calm and silent, then just scream."[13]

33.     At no point prior to LAPD's deployment of munitions did Mr. Montemayor hear any announcements, warnings, or direction from any LAPD officer. At no point did Mr. Montemayor observe any demonstrators conduct themselves in anything other than a peaceful manner, as the LAPD officers approached.

34.     Upon hearing the munitions, Mr. Montemayor dropped his end of the banner and moved in the opposite direction (eastbound) on Hollywood Boulevard.

35.     Within seconds, Mr. Montemayor resumed holding the banner with Ms. Bruketta. He and Ms. Bruketta were terrified, and slowly walked backward, away from the skirmish line, while raising the banner.  They complied with what appeared to be the LAPD officers' efforts to push the demonstrators eastbound on Hollywood Boulevard. Mr. Montemayor held the upper right corner of the banner in his left hand, and held his empty right hand open and above his head to show the officers he was unarmed. Ms. Bruketta held the left side of the banner.

/ / /

/ / /

/ / /

/ / /

/ / /

_____

[13] https://www.lamag.com/citythinkblog/protesters-la-why-they-march/

36.     Local news station KTLA5 captured Mr. Montemayor and Ms. Bruketta facing a line of armed LAPD officers while walking slowly backward at this time. Mr. Montemayor's right arm is raised above his head and is empty.



**Officers Rip the Banner from Mr. Montemayor and Shoot Him in the Groin**

37.     More armed LAPD officers begin running eastbound toward the dispersing marchers.  At some point, an LAPD officer fired an unidentified projectile which hit Mr. Montemayor in the right leg.

38.     Mr. Montemayor and Ms. Bruketta continued walking slowly backward with the raised banner.



COMPLAINT FOR DAMAGES & DECLARATORY RELIEF

-9-

39.     Just as Mr. Montemayor and Ms. Bruketta entered the Ivar intersection, several LAPD officers swarmed Ms. Bruketta and, without announcement or warning, ripped the banner from her hands, grabbed her by the arm, and threw her to the side.



40.     The officers' attack of Ms. Bruketta caused Mr. Montemayor, who was still holding the other side of the banner, to lose his footing and propel forward.  He took hold of the banner in both his hands as he tried to regain his balance.

41.     Suddenly, Officer Defendants Does 1 and 2 charged at Mr. Montemayor. Mr. Montemayor immediately dropped the banner from his left hand, took several steps backward, and raised his arms to show the officers that he was unarmed and not a

COMPLAINT FOR DAMAGES &
DECLARATORY RELIEF
-10-

threat. Officer Defendant Doe 1 ripped the banner from Mr. Montemayor's right hand, crumpled it in his hands, and walked away.



42.    Officer Defendant Doe 2 then aggressively shoved Mr. Montemayor, whose hands were now visibly empty.



43.    Seconds later, Officer Defendant Doe 3, who was standing less than ten feet away, aimed a green 40-millimeter launcher ("40mm") at Mr. Montemayor and

1    shot him in the groin.



13    44.    Officer Defendant Doe 3 never spoke a single word to Mr. Montemayor or

14    gave any kind of warning to Mr. Montemayor before shooting him. No more than six or

15    seven seconds elapsed from the time Officer Defendants Does 1 and 2 advanced toward

16    Ms. Bruketta and Mr. Montemayor to the time Officer Defendant Doe 3 shot Mr.

17    Montemayor.

18    45.    At the time the Officer Defendants attacked Mr. Montemayor, he was not

19    resisting arrest and posted no immediate threat of violence or physical harm to the

20    officers or others present.

21    46.    Mr. Montemayor screamed in agony after being shot in the groin with the

22    projectile. He felt excruciating pain radiating from his groin that intensified with each

23    passing minute. Mr. Montemayor immediately tried to leave the protest, but he could

24    barely walk due to the debilitating pain. He sat down on a curb for some time before

25    making his way out of the protest. His right testicle immediately swelled to the size of a

26    grapefruit.

27    47.    At no point did Mr. Montemayor hear LAPD officers declare an unlawful

28    assembly or give a dispersal order.

COMPLAINT FOR DAMAGES &
DECLARATORY RELIEF                        -12-

**LAPD's 40mm Weapon**

48.     The 40mm weapon, what LAPD calls a "40 mm less lethal launcher," deploys kinetic energy impact munitions.  It is a so-called pain compliance tool that can result in serious bodily injury or death.

49.     LAPD officers fire eXact iMpact ammunition from their 40mm weapons.  EXact iMpact rounds are high-speed projectiles with plastic and hard foam components.  Each round is 1.60 inches in diameter and 4.14 inches in length.

**Image depicts approximate size**



50.     Defense Technology, the eXact iMpact manufacturer, describes the ammunition as a "'point-of-aim, point-of-impact' direct fire round that is most commonly used by tactical teams in situations where maximum deliverable energy is desired for the incapacitation of an aggressive, non-compliant subject."  The optimal range "most successful for incapacitation" is 5-40 meters.  Targeting "the large muscle groups of the buttocks, thigh, and even the knees . . . provides sufficient pain stimulus, while greatly reducing serious or life-threatening injuries."

**Mr. Montemayor Undergoes Emergency Surgery**

51.     After making his way out of the Hollywood area, Mr. Montemayor went to

Urgent Care.  The treating physician noted that his right testicle was the size of a grapefruit and his left testicle was swollen as well. Mr. Montemayor was immediately transferred to the ER.

52.     At the ER, medical personnel performed a scrotal ultrasound. The surgeon told Mr. Montemayor that he had fifty percent risk of right testicle loss and twenty percent risk of left testicle loss. He recommended immediate surgery.  Mr. Montemayor underwent emergency testicular surgery that same day. The surgery involved piecing back together portions of his testicle which had exploded upon impact by the "pain compliance" projectile when he was shot in the groin by the LAPD officer.

### Mr. Montemayor Undergoes Emergency Surgery

53.     After the incident, Mr. Montemayor experienced severe and persistent pain in his groin and lower back.  Due to the pain, he had difficulties sleeping and sitting, and could not even drive his car.

54.     Mr. Montemayor was unable to work for a significant period of time.  He was not able to do several film production jobs due to his injury and related pain because the jobs required that he move and lift objects on film sets.

55.     Mr. Montemayor received medical treatment from his primary care physician and a lower back specialist.  The lower back specialist determined that Mr. Montemayor had a bulged disc causing him severe and debilitating lower back pain, resulting from the trauma of being shot in the groin by the pain compliance projectile.

56.     Per his lower back specialist's recommendation, Mr. Montemayor underwent physical therapy.  He attended physical therapy sessions one to two times a week for ten weeks. While Mr. Montemayor made some progress, his physical therapist advised him that he would have to consider injections or surgery if his progress stagnates.

57.     Before the incident, Mr. Montemayor was very physically active. He enjoyed hiking, running, surfing, and cycling, which he did on a regular basis, and was planning to train for a marathon.  Due to his injury and related pain, Mr. Montemayor

could not engage in any of these activities.  To this day, Mr. Montemayor is not as physically active as he was before the incident.

58.     Since the incident, Mr. Montemayor has suffered emotional harm, including but not limited to, severe emotional distress, loss of sleep, loss of enjoyment of life, anxiety, fear, and anger.  Every time Mr. Montemayor sees a police officer, he has flashbacks of being attacked by Defendants and experiences the trauma all over again.

59.     Mr. Montemayor intends in the future to exercise his constitutional right to freedom of speech and association by engaging in expressive activities in the City of Los Angeles.  Defendants' conduct described herein has created uncertainty with respect to Mr. Montemayor's exercise now and in the future of his constitutional rights and has chilled his exercise of these rights.

60.     Mr. Montemayor has not attended a protest since June 2 because he fears that, when he engages in protest activities, Defendants will again employ indiscriminate, unreasonable or excessive force, injuring and terrifying him and other protestors.

61.     Mr. Montemayor was unjustifiably punished for exercising his First Amendment rights and peacefully expressing his frustration and sadness over the police killing of George Floyd.  Instead of protecting citizens, Defendant Doe 3 acted recklessly when he targeted the unarmed Mr. Montemayor and shot him in the groin with a high-speed projectile from a close distance without warning or justification.

## VI.   FACTUAL ALLEGATIONS COMMON TO *MONELL* CAUSES OF ACTION

62.     On June 30, 2020, the Los Angeles City Council ("City Council") approved a motion directing the LAPD to prepare an After-Action Report reviewing the LAPD's actions during the May-June 2020 protests. The City Council requested that Gerald Chaleff, the author of LAPD's review of the 2007 May Day protests, lead the review.  The LAPD ultimately decided to conduct its own after-action review.

COMPLAINT FOR DAMAGES &
DECLARATORY RELIEF                        -15-

63.   In July 2020, the Los Angeles Board of Police Commissioners asked the National Police Foundation ("NPF") to conduct an after-action review assessment, and analysis of the LAPD's actions during the May-June 2020 protests.  The Los Angeles Police Foundation funded the National Police Foundation's after-action review.

64.   Mr. Chaleff and his review team[14] prepared "An Independent Examination of the Los Angeles Police Department 2020 Protest Response," ("Chaleff's After-Action Report"), which was transmitted to the City Council on March 10, 2021.

65.   LAPD's after-action report, "SAFE LA Civil Unrest 2020 After Action Report," ("LAPD Internal After-Action Report") was released on April 9, 2021.

66.   The National Police Foundation's Report, "A Crisis of Trust: A National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27 – June 7, 2020" ("NPF After-Action Report) was released on April 9, 2021.

## Chaleff After-Action Report

67.   The Chaleff After-Action Report found the LAPD's response to the May-June 2020 protests deficient in the following areas: (1) planning, (2) command and control, (3) public order policing, (4) less lethal tools, (5) mass arrests, (6) preparedness and training, and (7) wellness.  The Report lists 67 findings across these six areas.

68.   The "Planning Findings" include the following:

    a.   "There was a lack of a unified message from City leaders to de-escalate the violence so that peaceful protestors could exercise their First Amendment rights."

    b.   "There was a lack of firm executive-level direction to the Department command officers to prepare and plan for potential widespread civil unrest and demonstrations which contributed to the problems cited

---

[14] Mr. Chaleff led a review team consisting of other retired LAPD officers and a law enforcement consultant.

COMPLAINT FOR DAMAGES & DECLARATORY RELIEF

-16-

throughout this report."

69.    The "Public Order Policing Findings" include the following:

a.   "There was a lack of training to properly prepare command officers for managing large crowds with the possibility of civil unrest and many command officers stated they did not feel confident in handling these incidents."

70.    The "Less Lethal Tools Findings" include the following:

a.   "The deployment of less lethal munitions was not always done at the direction of a supervisor or officer. In some instances, officers were directed to be in front of a skirmish line and left to deploy less lethal tools, including the 40 mm, with no direction or coordination."

b.   "The Department's Use of Force Tactics directive authorizing the use of 40mm has no detailed guidance on use in public order policing situations."

c.   "[T]he Review Team did not find the two hours of training to be sufficient given the skill level needed to deploy the 40mm in a chaotic public order policing environment."

d.   "Officers are required to be trained one time on the 40mm system. Deploying the 40mm in public order policing situations requires recurring certification and training."

e.   "The last training for the 40mm for officers, other than those going through recruit training, was in 2018."

71.    The "Preparedness and Training Findings" include the following:

a.   "Annual, hands on training on public order policing for command staff diminished over time resulting in many command staff in 2020 not being prepared for the civil unrest."

b.   "[A]dditional training and mentoring in crowd control tactics and specific incident command system positions, such as incident

commander, operations chief, logistics, etc. are needed and should be conducted on an annual basis."

c. "Training on the 40mm system use during crowd control situations was insufficient."

72.   The Chaleff After-Action Report issued 22 recommendations, which include:

a. "Undertake an extensive study of all less lethal munitions, including the 40 mm round, to examine performance, consistent velocity, potential for ricochets, influence of the plastic wrapping or banding around the sponge projectile and other aspects of the round. Included in that study should be any potential new technology for use in public order policing operations."

b. "Design and implement an inventory system to audit and track the amount of less lethal munitions, including the 37mm and 40mm rounds, expended during any public order policing incidents."

c. "Update the use of force tactical directives to include more detailed instruction regarding the use of less lethal tools in crowds and the approval level required for the deployment of each the less lethal tools."

d. "Establish protocols that: (a) Only trained (certified) members of Metropolitan Division or officers who receive consistent and periodic instruction and certification in the 40mm system should be allowed to deploy the 40mm during crowd control situations, (b) Retain the use of the 40mm system for all other officers during patrol duties and ensure annual retraining of weapon manipulations during shotgun qualification, and (c) Mandate the use of body worn video (when feasible) to record problem behavior of individuals in the crowd when officers decide to use the target specific 40mm in a crowd control situation."

**NPF After-Action Report**

73. The NPF After-Action Report lists 22 findings, which include:

   a. LAPD's policies and practices "were inadequate to handle the disparate groups, or to identify leaders amongst the protesters and address the level of violence."

   b. "Some LAPD personnel had not been provided contemporary training on crowd management, mobile field force, supervision, de-escalation, or the use of less-lethal instruments prior to the First Amendment assemblies and demonstrations from May 27 through June 7, 2020. Many of the LAPD training bulletins, courses, and directives related to crowd management and control were outdated."

   c. LAPD "do[es] not have one policy directing response specifically to large scale, fluid, city-wide civil unrest that turns violent or contains violence."

   d. Communication "between the Chief, his command staff, bureau commanders and field supervisors, and line officers" was inconsistent and "created significant challenges regarding: (a) identifying a cogent operating philosophy; (b) determining operations during individual shifts, including when shifts started and ended; and, (c) establishing coordination and consistency between shifts." This "impacted every component of the LAPD response" to the protests.

74. The NPF's recommendations include:

   a. "LAPD should synthesize the relevant provisions spread throughout the current Department and clearly establish guidelines for the coordination, facilitation, and management of First Amendment assemblies and protests."

   b. "LAPD should review national and international best practices regarding the impact of police actions on First Amendment assembly

-19-

and protest participants."

    c.  LAPD should "develop[] strategies, tactics, and Mobile Field Force teams to more effectively respond to these types of First Amendment assemblies and protests, which are becoming more frequent in the City and nationwide."

    d.  "LAPD should consider developing an overarching 'response to fluid dynamic protests and civil unrest' policy that provides for the nuances of this type of event, incorporates critical thinking skills and offers decision making models to guide at what points uses of force and relevant tools are permitted to be used by LAPD officers."

### **LAPD Internal After-Action Report**

75.    According to the LAPD, officers deployed 11,305 rounds of "less-lethal munitions" during the May-June protests, comprised of:

    a.  4,377 37mm projectile rounds

    b.  2,621 40mm projectile rounds

    c.  4,307 beanbag shotgun rounds

76.    The LAPD's Internal After-Action Report list recommendations in twenty-six areas of improvement. Some of these recommendations highlighted the LAPD's inadequate command and control training and deficiencies regarding communications and unity of command.

77.    One specific recommendation is: "The Department used a significant amount of less-lethal munitions to protect the City and restore order. The Department should continue to research and seek best practices related to the deployment of less-lethal munitions. This should include an examination of the Department's current less-lethal capabilities and new available technologies. A clear understanding regarding when to deploy less-lethal and the level of approval necessary should be reiterated and clarified to avoid confusion. When less-lethal is deployed, when available it should be used in conjunction with BWV to capture the activity leading up to the decision to use

less-lethal. Officers trained in less-lethal should attend annual weapons manipulation training."

78.     The LAPD Internal After-Action Report does not address the thousands of citizen complaints arising from these protests.

79.     Despite all evidence to contrary, Chief Moore stated that the "vast majority of [LAPD] personnel performed admirably" during the protests in his letter to the Police Commission accompanying the LAPD Internal After-Action Report.

### SAFE LA Task Force

80.     The SAFE LA Task Force was established to handle personnel complaints arising out of the May-June 2020 protests.

81.     On April 9, 2021, the Board of Police Commissioners received the "SAFE LA Task Force Update Report" from Chief Moore.

82.     According to the Report, the Office of the Inspector General received 2,850 personnel complaints related to the protests. The SAFE LA Task Force initiated 210 complaint investigations, of which 73 were related to excessive use of force.  As of April 9, 2021, 33 of these investigations were reviewed and no allegations for unauthorized force were sustained.

### LAPD's Use of Force Review Board Found the Officers' Conduct Within Policy

83.     LAPD's Use of Force Review Board ("UOFRB") investigated the Defendant Officers' use of force against Mr. Montemayor.  The UOFRB's adjudication was: Tactics/Tactical Debrief, Non-Lethal Use of Force/In-Policy, and Less-Lethal Use of Force/In-Policy.

84.     As of April 9, 2021, Chief Moore and the Board of Police Commissioners had not made final findings regarding the incident.

### LAPD's History of Lawsuits Resulting from Excessive Force at Protests

85.     In the years preceding the May-June 2020 protests, the City has settled the following class action lawsuits alleging that LAPD officers used unreasonable and excessive force against peaceful protestors in violation of their First and Fourth

Amendment rights:

    a. *National Lawyers Guild, et al. v. City of Los Angeles, et al*., No. CV 01-6877 FMC(CWx): class action arising out of LAPD's use of unlawful force and disruption of lawful assemblies during the 2000 Democratic National Convention.  The $5 million settlement addressed the use of "less-lethal" weapons and chemical munitions to disperse peaceful protestors.

    b. *Multi-Ethnic Worker Organizing Network v. City of Los Angeles*, No. 2:07-cv-03072-AHM(FFM) (C.D. Cal.): class action for LAPD's excessive use of force and related conduct at 2007 May Day protests. The case settled for $12.8 million and resulted in a Structural Relief Order which included that less lethal weapons may not be used on lawfully dispersing or retreating persons or crowds, and when feasible, notice should be given before deploying less lethal weapons in a crowd control incident or for dispersal.  The Order also stated that unlawful assembly orders must use an amplified loudspeaker, and if there is no serious violence occurring, the order shall be made repeatedly over a period of time, including an "objectively reasonable" period of time to disperse and identification of "a clear and safe route" to follow to disperse.

    c. *Aichele v. City of Los Angeles*, No. CV 12-10863-DMG (FFMx) (C.D. Cal.): class action for injunctive relief and damages for arrests and related actions regarding the shutdown of Occupy LA's use of the City Hall lawn in 2011. The $2.45 million settlement included that LAPD officers should not "kettle" protestors attempting to comply with a dispersal order.

    d. *Chua v. City of Los Angeles*, No. 2:16-cv-00237-JAK(GJSx) (C.D. Cal.): class action for LAPD violence during the 2014 Ferguson

protests, which settled for $750,000.  The settlement stated that demonstrators shall not be "kettled" after being given a dispersal order.

86.     Chief Moore, as well as members of his command staff, officers to whom he has delegated his responsibility to enact and implement lawful policies on use of force (including the 40mm launcher), public order policing, dispersal orders, and declaration of an unlawful assembly, are aware of the ongoing unlawful policies, practices, and customs of the City and the LAPD which resulted in the above settlements.  Despite the above settlements, these unlawful policies, practices, and customs continue under the City and Chief Moore's command.

## FIRST CLAIM FOR RELIEF

### Excessive Force (4th and 14th Amendments; 42 U.S.C. § 1983)

(Plaintiff Against All Doe Defendants)

87.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

88.     All of the acts of Defendants and the persons involved were done under color of state law.

89.     The acts of the Officer Defendants deprived Benjamin Montemayor of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, subjecting him to unreasonable and excessive force. Specifically, the Officer Defendants and the involved officers unreasonably attacked and shot Benjamin Montemayor with less-lethal force without justification, resulting in grievous bodily injury to Mr. Montemayor's person.

90.     Each of the Officer Defendants was both personally involved and an integral participant in the violation of Mr. Montemayor's constitutional rights because each officer was aware of the unlawful actions of the other Officers, did not object to these violations of Mr. Montemayor's rights, and participated in the violations by

performing police functions, including meaningful participation in the needless and unnecessary operation to escalate the encounter with Mr. Montemayor and use unjustified less-than-lethal force.

91.     As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Montemayor sustained and incurred damages including pain, suffering, and emotional injury.

92.     The conduct of Defendants Does 1-5 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

<u>**SECOND CLAIM FOR RELIEF**</u>

**Failure to Intervene (4th and 14th Amendments; 42 U.S.C. § 1983)**

(Plaintiff Against All Doe Defendants)

93.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

94.     All of the acts of Defendants and the persons involved were done under color of state law.

95.     The acts of the Officer Defendants deprived Benjamin Montemayor of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, failing to intervene in the unlawful actions of other officers, including ripping the protest banner from Mr. Montemayor's hands, shoving him while he was unarmed, and shooting him in the groin with less-lethal force at close range without justification.

96.     Each of the Officer Defendants was both personally involved and an integral participant in the violation of Mr. Montemayor's constitutional rights because

COMPLAINT FOR DAMAGES &
DECLARATORY RELIEF

-24-

each officer was aware of the unlawful actions of the other Officers, did not object to these violations of Mr. Montemayor's rights, and participated in the violations by performing police functions, including meaningful participation in the needless and unnecessary operation to escalate the encounter with Mr. Montemayor and use unjustified less-than-lethal force.

97.    As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Montemayor sustained and incurred damages including pain, suffering, and emotional injury.

98.    The conduct of Defendants Does 1-5 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

### THIRD CLAIM FOR RELIEF

**Freedom of Speech (1st and 14th Amendments; 42 U.S.C. § 1983)**

(Plaintiff Against All Doe Defendants)

99.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

100.    All of the acts of Defendants and the persons involved were done under color of state law.

101.    The acts of the Officer Defendants deprived Benjamin Montemayor of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the First Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, retaliating against Mr. Montemayor for engaging in constitutionally protected activity.

102.    Plaintiff engaged in constitutionally protected acts of observing, recording, and participating in an event of public interest, specifically a public demonstration, and

1    in expressing his political views.

2        103.   Defendants targeted and/or retaliated against Plaintiff for engaging in
3    constitutionally protected activity and for the content and viewpoint of his expressions.

4        104.   Defendants' acts would chill a reasonable person from continuing to
5    engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiff
6    from continuing to observe, record, and participate in the June 2 protest and to
7    participate in other peaceful protests.

8        105.   As a direct and proximate result of the aforementioned acts or omissions of
9    Defendants, Mr. Montemayor sustained and incurred damages including pain, suffering,
10   and emotional injury.

11       106.   The conduct of Defendants Does 1-5 was willful, wanton, malicious, and
12   done with an evil motive and intent and a reckless disregard for the rights of the
13   Plaintiff and therefore warrants the imposition of exemplary and punitive damages
14   against each individual Defendant (but not the entity Defendant) in an amount adequate
15   to punish the wrongdoers and deter future misconduct.

16              **FOURTH CLAIM FOR RELIEF**

17   **Municipal Liability—Unconstitutional Policy, Practice, Custom (42 U.S.C. § 1983)**

18        (Plaintiff Against Defendants City, Moore, and Does 6-10)

19       107.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs
20   as though fully set forth herein.

21       108.   As described above, the acts of Defendants Does 1-5 deprived Benjamin
22   Montemayor of his rights under the United States Constitution.

23       109.   Defendants Does 1-5 acted under the color of law.

24       110.   The individual Defendants acted pursuant to expressly adopted official
25   policies or longstanding practices or customs of Defendants City, Chief Moore, and
26   Does 6-10.

27       111.   Based on the aforementioned facts, Defendants City, Chief Moore, and
28   Does 6-10 as policymakers and supervisors maintained the following unconstitutional

COMPLAINT FOR DAMAGES &
DECLARATORY RELIEF                        -26-

customs, practices, and policies:

    a.  Using excessive force, including excessive less than lethal force in crowd control situations including but not limited to engaging with peacefully protesting individuals;

    b.  Providing inadequate training regarding the use of "less lethal" force in crowd control situations, including during encounters with individuals who are peacefully protesting;

    c.  Employing and retaining as Officers and other personnel, including Defendants Does 1-5, who Defendants City, Chief Moore, and Does 6-10 at all times material herein, knew or reasonably should have known had dangerous propensities for abusing their authority and for mistreating citizens by failing to follow written LAPD policies and for using excessive force;

    d.  Inadequately supervising, training, controlling, assigning, and disciplining LAPD officers including Defendants Does 1-5, who Defendants City, Chief Moore, and Does 6-10 each knew, or in the exercise of reasonable care, should have known had the aforementioned propensities and character traits;

    e.  Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, and disciplining and controlling the intentional misconduct by LAPD Officers including Defendants Does 1-5;

    f.  Failing to adequately discipline LAPD Officers, including Defendants Does 1-5, for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct;

    g.  Announcing that unjustified uses of force are "within policy," including uses of force later determined in court to be unconstitutional;

h. Refusing to discipline, terminate, or retrain the Officers involved, even where uses of force were determined in court to be unconstitutional and where Officers commit repeated constitutional violations;

i. Encouraging, accommodating, or facilitating a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," or simple "code of silence," pursuant to which Officers do not report other Officers' errors, misconduct or crimes. Pursuant to this code of silence, if questioned about an incident of misconduct involving another deputy, while following the code, the deputy being questioned will claim ignorance of the other Officers' wrongdoing;

j. Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of police uses of force, including by failing to discipline, retrain, investigate, terminate, and recommend Officers for criminal prosecution who participate in using excessive force against unarmed people;

k. Covering up police misconduct and refusing to release information about police misconduct to the public even when required to do so by law. These customs and practices by Defendants City, Chief Moore, and Does 6-10 were condoned by said Defendants in deliberate indifference to the safety and rights of its civilians, including Plaintiff.

l. Failing to follow or enforce compliance by Officers with the LAPD's own policies.

m. Failing to follow or enforce compliance by Officers with national law enforcement training and standards.

112. Defendants City, Chief Moore, and Does 6-10 together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above. Despite having knowledge as stated above, these Defendants condoned, tolerated and through

actions and inactions ratified such policies. Said Defendants also acted with deliberate indifference to both the foreseeable effects and consequences of these policies and to the constitutional rights of Plaintiff, and other individuals similarly situated.

113.   By perpetuating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, Defendants City, Chief Moore, and Does 6-10 acted with an intentional, reckless, callous disregard for the well-being of Mr. Montemayor and his constitutional as well as human rights. Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by Defendants City, Chief Moore, and Does 6-10 were affirmatively linked to and were a significantly influential and moving force behind the injuries of Mr. Montemayor.

114.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Montemayor sustained and incurred damages including pain, suffering, and emotional injury.

115.   The conduct of Defendants City, Moore, and Does 6-10 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## FIFTH CLAIM FOR RELIEF

### Municipal Liability—Ratification (42 U.S.C. § 1983)

(Plaintiff Against Defendants City, Moore, and Does 6-10)

116.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

117.   As described above, the acts of Defendants Does 1-5 deprived Benjamin Montemayor of his rights under the United States Constitution.

118.   Upon information and belief, the City, Chief of Police Moore, and Does 6-10 as final policymakers, acting under color of law, who had final policymaking authority concerning the acts of Defendants Does 1-5 ratified the individual

Defendants' acts and the bases for them. Upon information and belief, the final policymakers knew of and specifically approved of the individual Defendants' acts and found them to be justified and within policy.

119.   Upon information and belief, the City, Chief of Police Moore, and Does 6-10 as final policymakers, acting under color of law, have a history of ratifying unreasonable uses of force, including unreasonable less than lethal force.

120.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Montemayor sustained and incurred damages including pain, suffering, and emotional injury.

121.   The conduct of Defendants City, Moore, and Does 6-10 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## SIXTH CLAIM FOR RELIEF

### Municipal Liability—Failure to Train, Supervise, Discipline, or Correct

### (42 U.S.C. § 1983)

(Plaintiff Against Defendants City, Moore, and Does 6-10)

122.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

123.   As described above, the acts of Defendants Does 1-5 deprived Benjamin Montemayor of his rights under the United States Constitution.

124.   Defendants Does 1-5 acted under the color of law.

125.   The individual Defendants acted pursuant to expressly adopted official policies or longstanding practices or customs of Defendants City, Chief Moore, and Does 6-10.

126.   On information and belief, Defendants City, Chief Moore, and Does 6-10, acting under color of law, failed to properly and adequately train Does 1-5, including

1    but not limited to, with regard to the use of physical force and less than lethal force.

2        127.   In addition, the training policies of the City of Los Angeles were not

3    adequate to train its officers to handle the usual and recurring situations with which they

4    must deal, including but not limited to encounters with individuals who are peacefully

5    exercising their First Amendment rights.  The City of Los Angeles failed to adequately

6    train its officers on public order policing, using the 40mm in crowd control situations,

7    and isolating and removing small groups of violent or criminal individuals within a

8    larger group of peaceful protestors, and failed to adequately supervise, direct, and/or

9    coordinate its officers' deployment of the 40mm munitions during the protests.

10       128.   The City of Los Angeles knew that its failure to adequately train its

11   officers on public order policing, using the 40mm in crowd control situations, and

12   isolating and removing small groups of violent or criminal individuals within a larger

13   group of peaceful protestors made it highly predictable that its officers would engage in

14   conduct that would deprive persons such as Mr. Montemayor of their rights. The City of

15   Los Angeles knew that its failure to adequately supervise, direct, and/or coordinate its

16   officers' deployment of 40mm munitions made it highly predictable that its officers

17   would engage in conduct that would deprive persons such as Mr. Montemayor of their

18   rights. The City of Los Angeles was thus deliberately indifferent to the obvious

19   consequences of its failure to train its officers adequately.

20       129.   Properly trained officers are trained to facilitate peaceful protestors'

21   exercise of their First Amendment rights.

22       130.   Properly trained officers are trained to use less than lethal force only in

23   response to someone violently resisting arrest or who poses an immediate threat of

24   violence or physical harm. Defendant Does 3 used lethal force against Mr. Montemayor

25   even though he was not violently resisting arrest and posed no immediate threat of

26   violence or physical harm to the Officers or anyone else.

27       131.   Defendants City, Chief Moore, and Does 6-10 furthermore failed to

28   enforce compliance by LAPD Officers with national law enforcement training and

standards.

132.   Defendants City, Chief Moore, and Does 6-10 were deliberately indifferent to the obvious consequences of its failure to train their Officers adequately. They knew that the failure to adequately train their Officers made it highly predictable that their Officers would engage in conduct that would deprive persons of their constitutional rights.

133.   The failure of Defendants' City, Chief Moore, and Does 6-10 to provide adequate training regarding, *inter alia*, the use of 40mm in crowd control situations, resulted in the wrongful uses of force against Mr. Montemayor. The failure of Defendants City, Chief Moore, and Does 6-10 to provide adequate training caused the deprivation of Mr. Montemayor's rights by Defendants Does 1-5; that is, Defendants' failure to train is so closely related to the deprivation of Mr. Montemayor's rights as to the be moving force that caused the ultimate injury.

134.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Montemayor sustained and incurred damages including pain, suffering, and emotional injury.

135.   The conduct of Defendants City, Moore, and Does 6-10 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## SEVENTH CLAIM FOR RELIEF

### Violation of the Bane Act (Cal. Civil Code § 52.1)

(Plaintiff Against All Defendants)

136.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

137.   Article I, section 13 of the California Constitution and the Fourth Amendment to the United States Constitution guarantee the right of persons to be free

from the use of unnecessary and excessive force on the part of law enforcement officers.  Defendants, by engaging in the wrongful acts and failures to act alleged in this action, denied this right to Benjamin Montemayor by threats, intimidation, or coercion, to prevent Plaintiff from exercising his right to be free of excessive force, and/or in retaliation for Plaintiff's exercise of these rights, thus giving Plaintiff a claim for damages pursuant to Cal. Civ. Code § 52.1.

138.    Defendant Officers' uses of unreasonable force was a substantial factor in causing Mr. Montemayor's harm.

139.    The City of Los Angeles is vicariously liable for its officers' misconduct.

140.    As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Montemayor sustained and incurred damages including pain, suffering, and emotional injury.

141.    The conduct of Defendants was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

142.    As the direct and legal result of Defendants' conduct, Plaintiff suffered and will continue to suffer damages, including but not limited to those set forth above, and is entitled to statutory damages under Cal. Civ. Code § 52, including damages up to three times Plaintiff's actual damages but no less than $4,000 for every offense of California Civil Code § 51 *et seq.*, as well as compensatory and punitive damages and attorneys' fees.

## EIGHTH CLAIM FOR RELIEF

### Violation of the Ralph Act (Cal. Civil Code § 51.7)

(Plaintiff Against All Defendants)

143.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

144.   Defendants' conduct violated Plaintiff's right to be free from violence and intimidation by threat of violence because of his actual or perceived race, color, religion, ancestry, national origin, political affiliation and/or viewpoint, in violation of California Civil Code section 51.7.

145.   Defendant Officers' uses of unreasonable force was a substantial factor in causing Mr. Montemayor's harm.

146.   The City of Los Angeles is vicariously liable for its officers' misconduct.

147.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Montemayor sustained and incurred damages including pain, suffering, and emotional injury.

148.   The conduct of Defendants was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## NINTH CLAIM FOR RELIEF

### Assault

(Plaintiff Against All Defendants)

149.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

150.   Defendants aimed both lethal and less than lethal weapons at Mr. Montemayor's person with threats to use them upon him. Mr. Montemayor reasonably believed that the officers would use such force against his person.

151.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Montemayor sustained and incurred damages including pain, suffering, and emotional injury.

152.   The City of Los Angeles is vicariously liable for the actions of the Officer Defendants.

153.   The conduct of Defendants Does 1-5 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## TENTH CLAIM FOR RELIEF

### Battery by Peace Officer

(Plaintiff Against all Defendants)

154.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

155.   The Officer Defendants and the involved officers intentionally touched Mr. Montemayor by attacking, shoving, and shooting him in the groin without justification, resulting in grievous bodily injury to Mr. Montemayor's person.

156.   Mr. Montemayor did not consent to the Officers Defendants' uses of force.

157.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Montemayor sustained and incurred damages including pain, suffering, and emotional injury.

158.   Defendant Officers' uses of unreasonable force was a substantial factor in causing Mr. Montemayor's harm.

159.   The City of Los Angeles is vicariously liable for the actions of the Officer Defendants.

160.   The conduct of Defendants Does 1-5 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

/ / /

/ / /

## ELEVENTH CLAIM FOR RELIEF

### Negligence

### (Plaintiff Against All Defendants)

161.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

162.   The conduct of Defendants as set forth herein, was tortious in that Defendants breached their duty of care to Mr. Montemayor, an unarmed, non-threatening, and non-resisting protestor, when the Officer Defendants targeted, attacked, and shot Mr. Montemayor with a 40mm impact projectile.

163.   Defendants City, Moore, and Does 6-10 failed to appropriately supervise, review, and ensure that its officers abided by the standard of care and failed to enact appropriate standards and procedures that would have prevented such harm to Mr. Montemayor.

164.   As a result of the conduct of the Defendants as alleged herein, Mr. Montemayor sustained and incurred physical and emotional damages.

165.   The conduct of Defendants was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## TWELFTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

### (Plaintiff Against All Defendants)

166.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

167.   Defendants' actions in targeting, attacking, and shooting Benjamin Montemayor in the groin with a hard foam projectile within close range was outrageous. This conduct was performed with reckless disregard to the effect that these

1    actions and omissions would have upon Mr. Montemayor, including emotional distress.

2        168.    As a direct and proximate result of the aforementioned acts or omissions of

3    Defendants, Mr. Montemayor sustained and incurred damages including pain, suffering,

4    and emotional injury.

5        169.    The City of Los Angeles is vicariously liable for the actions of the Officer

6    Defendants.

7        170.    The conduct of Defendants Does 1-5 was willful, wanton, malicious, and

8    done with an evil motive and intent and a reckless disregard for the rights of the

9    Plaintiff and therefore warrants the imposition of exemplary and punitive damages

10   against each individual Defendant (but not the entity Defendant) in an amount adequate

11   to punish the wrongdoers and deter future misconduct.

12                        **THIRTEENTH CLAIM FOR RELIEF**

13                       **Declaratory Relief (28 U.S.C § 2201)**

14                        (Plaintiff Against All Defendants)

15       171.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs

16   as though fully set forth herein.

17       172.   There is an actual controversy between Plaintiff and Defendants

18   concerning their respective rights and duties in that Plaintiff contends that the acts of

19   Defendants, as described herein, are in violation of federal and state law, and

20   Defendants contend in all aspects to the contrary.

21       173.   Plaintiff is entitled to a legal declaration of his rights and Defendants'

22   obligations under the applicable laws as alleged in this Complaint.

23                            **PRAYER FOR RELIEF**

24       WHEREFORE, Plaintiff prays for the following relief:

25       1.     For compensatory, general and special damages against each Defendant,

26   jointly and severally, amounts to be proven at trial;

27       2.     For punitive and exemplary damages against individually named

28   defendants, Defendant Moore and Defendant Does 1-10 in an amount appropriate to

COMPLAINT FOR DAMAGES &           -37-
DECLARATORY RELIEF

1   punish Defendant(s) and deter others from engaging in similar misconduct;

2       3.      For prejudgment interest;

3       4.      For costs of suit and reasonable attorneys' fees and costs as authorized by

4   statute or law;

5       5.      For restitution as the Court deems just and proper;

6       6.      For a declaratory judgment that Defendants violated Plaintiff's rights under

7   the Fourth Amendment, First Amendment, Cal. Civ. Code §§ 51.7, 52.1, and other

8   rights under state law.

9       7.      For such other relief, including injunctive relief, as the Court may deem

10  proper.

11                          **<u>DEMAND FOR JURY TRIAL</u>**

12          Plaintiff hereby demands trial by jury on all issues so triable.

13

14  Dated: April 12, 2021                Respectfully Submitted,

15                                       HADSELL STORMER RENICK & DAI LLP

16

17                                       By:  ___/s/ Shaleen Shanbhag_____
                                             Dan Stormer
18                                           Barbara Enloe Hadsell
                                             Shaleen Shanbhag
19                                       Attorneys for Plaintiff
                                         BENJAMIN MONTEMAYOR
20

21

22

23

24

25

26

27

28